# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

MARK ELLIOTT,
      Petitioner,

v.                                Case No. 8:23-cv-636-KKM-TGW

SECRETARY, DEPARTMENT
OF CORRECTIONS,
      Respondent.
_____

## <u>ORDER</u>

Mark Elliott, a Florida prisoner, timely[1] filed a Petition for Writ of

Habeas Corpus under 28 U.S.C. § 2254, challenging his state-court

convictions for second-degree witness intimidation and felony battery

---

[1] A state prisoner has one year from the date his judgment becomes final to file a § 2254 petition. *See* 28 U.S.C. § 2244(d)(1). This one-year limitation period is tolled during the pendency of a properly filed state motion seeking collateral relief. *See id.* § 2244(d)(2). The appellate court affirmed Elliott's convictions on June 23, 2020. (Doc. 14-1, Ex. F.) His judgment became final 90 days later, on September 21, 2020, when the time to petition the Supreme Court of the United States for a writ of certiorari expired. *See Bond v. Moore*, 309 F.3d 770, 774 (11th Cir. 2002). The clock did not start at that point, however, because on September 9, 2020, Elliott had filed a motion to reduce sentence under Florida Rule of Criminal Procedure 3.800(c). (Doc. 14-1, Ex. H.) That motion was denied on October 27, 2020. (*Id.*, Ex. I.) Because the denial of a Rule 3.800(c) motion is unappealable, the clock started the next day. *Frazier v. State*, 766 So. 2d 459, 460 (Fla. 1st DCA 2000). After 227 days of untolled time, on June 12, 2021, Elliott moved to correct his sentence under Rule 3.800(a). (Doc. 14-1, Ex. J.) The motion remained pending until August 18, 2022, when the time to appeal its denial expired. (*Id.*, Ex. M.) The clock did not restart at that point because on June 23, 2022, Elliott had filed a petition alleging ineffective assistance of appellate counsel. (*Id.*, Ex. N.) The petition remained pending until December 22, 2022, when the time to seek rehearing from its denial expired. (*Id.*, Ex. Q.) At that point, Elliott had 138 days—or until May 10, 2023—to seek federal habeas relief. He met the deadline, filing his petition on March 22, 2023. (Doc. 1.) Therefore, the petition is timely.

(second offense). (Doc. 1.) Having considered the petition, (*id.*), the response in opposition, (Doc. 13), and the reply, (Doc. 15), the petition is denied. Because reasonable jurists would not disagree, a certificate of appealability also is not warranted.

## I.    <u>BACKGROUND</u>

This case arises from a domestic violence incident between Elliott and his girlfriend, Alexandra Torgerson. Around 3:00 p.m. on January 1, 2019, Elliott's daughter arrived home to find Elliott standing over Torgerson in the living room. (Doc. 14-1, Ex. S, at 34.) Torgerson was "crying" on the floor. (*Id.*) Torgerson asked Elliott's daughter to "call the police" because she had been "trying to leave for hours" and Elliott "wouldn't let her." (*Id.*) Elliott said that Torgerson "wasn't allowed to leave because she had taken money from him." (*Id.*) Torgerson "pulled [the] elastic band" of her leggings to "show she had nothing in there," but Elliott still "wouldn't let her leave." (*Id.* at 34–35.)

Torgerson's cellphone rang. (*Id.* at 35.) Elliott "lunged at her," grabbed her arm, and said, "You're not calling the cops." (*Id.* at 35–36.) He continued "trying to grab her so she couldn't run out the garage door." (*Id.* at 36.) Elliott's daughter separated them, hugged Torgerson, and

"whispered [to her] that [she] was going to call the cops and help her." (*Id.* at 37.) She left the house and called 911. (*Id.*)

Law enforcement arrived to find Elliott and Torgerson "hiding" in a closet. (*Id.* at 55.) Elliott was "sweaty" and "agitated"; Torgerson was "timid and afraid." (*Id.* at 56.) After the two were separated, Torgerson told an officer that "nothing happened." (*Id.* at 57.) The officer noticed "bruising" on both arms that "appeared to go from the forearm[s] into the biceps." (*Id.* at 59.) But Torgerson refused to allow the police to photograph the bruises, saying that she "didn't want to cooperate" with the investigation. (*Id.* at 59, 66.) She also claimed that she "wasn't a victim of any crime." (*Id.* at 73.)

Elliott was charged with second-degree witness intimidation and felony battery (second offense). (*Id.*, Ex. A, at 63–64.) Although he was initially appointed counsel, Elliott elected to proceed pro se at trial. (*Id.*, Ex. R; *id.*, Ex. S., at 10–11.) He testified in his defense, claiming that the incident was "nothing but a verbal argument." (*Id.*, Ex. S, at 123.) The jury found him guilty as charged.[2] (*Id.*, Ex. A, at 88–90.) After

---

[2] The jury separately found that Elliott had previously been convicted of battery. (Doc. 14-1, Ex. A, at 90.)

determining that he qualified as a habitual felony offender, the trial court sentenced Elliott to a total of 30 years' imprisonment—the statutory maximum for second-degree witness intimidation.[3] (*Id.* at 342–45.) The court explained that Elliott—a 21-time convicted felon—had spent "almost his entire life . . . in the criminal justice system." (*Id.* at 343.) It noted the "sheer variety of [his] criminal activity," which included "drugs, violence, theft, even paper crimes [such as organized fraud]." (*Id.* at 344.) In the court's view, the only "option" was to "punish and isolate the problem." (*Id.* at 344-45.)

After the convictions were affirmed on direct appeal, Elliott unsuccessfully sought various forms of postconviction relief in state court. (*Id.*, Exs. H–Q.) This federal habeas petition followed. (Doc. 1.)

## II. <u>STANDARD OF REVIEW UNDER SECTION 2254</u>

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs this proceeding. *Carroll v. Sec'y, DOC*, 574 F.3d 1354, 1364 (11th Cir. 2009). Habeas relief under the AEDPA can be granted only if a petitioner is in custody "in violation of the Constitution or laws

---

[3] Counsel represented Elliott at sentencing and on direct appeal. (Doc. 14-1, Ex. A, at 323; Doc. 14-1, Ex. D.)

or treaties of the United States." 28 U.S.C. § 2254(a). "The power of the federal courts to grant a writ of habeas corpus setting aside a state prisoner's conviction on a claim that his conviction was obtained in violation of the United States Constitution is strictly circumscribed." *Green v. Sec'y, Dep't of Corr.*, 28 F.4th 1089, 1093 (11th Cir. 2022).

Section 2254(d) provides that federal habeas relief cannot be granted on a claim adjudicated on the merits in state court unless the state court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

For purposes of § 2254(d)(1), the phrase "clearly established Federal law" encompasses the holdings only of the United States Supreme Court "as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). This section "defines two categories of cases in which a state prisoner may obtain federal habeas relief with respect to a claim adjudicated on the merits in state court." *Id.* at 404. First, a decision is "contrary to" clearly established federal law "if

the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Id*. at 413.

Second, a decision involves an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*. The AEDPA was meant "to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002). Accordingly, "[t]he focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable, and . . . an unreasonable application is different from an incorrect one." *Id*. at 694. As a result, to obtain relief under the AEDPA, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011); *see also Lockyer v. Andrade*, 538 U.S.

63, 75 (2003) (stating that "[t]he state court's application of clearly established federal law must be objectively unreasonable" for a federal habeas petitioner to prevail and that the state court's "clear error" is insufficient).

When the last state court to decide a federal claim explains its decision in a reasoned opinion, a federal habeas court reviews the specific reasons as stated in the opinion and defers to those reasons if they are reasonable. *Wilson v. Sellers*, 584 U.S. 122, 125 (2018). But the habeas court is "not limited by the particular justifications the state court provided for its reasons, and [it] may consider additional rationales that support the state court's determination." *Jennings v. Secretary, Fla. Dep't of Corr.*, 55 F.4th 1277, 1292 (11th Cir. 2022). When the relevant state-court decision is not accompanied with reasons for the decision—such as a summary affirmance without discussion—the federal court "should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale [and] presume that the unexplained decision adopted the same reasoning." *Wilson*, 584 U.S. at 125. The state may "rebut the presumption by showing that the

unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision." *Id.*

For purposes of § 2254(d)(2), "it is not enough to show that 'reasonable minds reviewing the record might disagree about the finding in question.'" *Brown v. Davenport*, 142 S. Ct. 1510, 1525 (2022) (quotations omitted). "An unreasonable determination of the facts occurs when the direction of the evidence, viewed cumulatively, was too powerful to conclude anything but the petitioners factual claim." *Teasley v. Warden, Macon State Prison*, 978 F.3d 1349, 1355 (11th Cir. 2020) (internal quotation marks and alterations omitted). A state court's findings of fact are presumed correct, and a petitioner can rebut the presumption of correctness afforded to a state court's factual findings only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

Even where a petitioner succeeds in rebutting the presumption, he must show that the state court's decision is "based on" the incorrect factual determination. *Pye v. Warden, Ga. Diagnostic Prison*, 50 F.4th 1025, 1035 (11th Cir. 2022). This is because a state court decision may still be reasonable "even if some of the state court's individual factual findings were erroneous—so long as the decision, taken as a whole,

doesn't constitute an 'unreasonable determination of the facts' and isn't 'based on' any such determination." *Id.* (quoting *Hayes v. Sec'y, Fla. Dep't of Corr.*, 10 F.4th 1203, 1224–25 (11th Cir. 2021) (Newsom, J., concurring)).

## III. <u>INEFFECTIVE ASSISTANCE OF COUNSEL</u>

Elliott alleges ineffective assistance of counsel under the Sixth Amendment. Under the well-known, two-part standard articulated in *Strickland v. Washington*, 466 U.S. 668 (1984), to succeed, he must show both deficient performance by his counsel and prejudice resulting from those errors. *Id.* at 687.

The first part "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* The lynchpin of this analysis is whether counsel's conduct "was reasonable considering all the circumstances." *Id.* at 688. A petitioner establishes deficient performance if "the identified acts or omissions [of counsel] were outside the wide range of professionally competent assistance." *Id.* at 690. A court "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.*

"[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.*

The second part requires showing that the deficient performance prejudiced the defense. *Id.* at 687. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691. To demonstrate prejudice, a petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

"The question [on federal habeas review of an ineffective assistance claim] 'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable—a substantially higher threshold.'" *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)). Consequently, federal petitioners rarely prevail on claims of ineffective assistance of counsel because "[t]he standards created by *Strickland* and § 2254(d) are both

highly deferential, and when the two apply in tandem, review is doubly so." *Richter*, 562 U.S. at 105 (quotation and citations omitted).

## IV.   <u>ANALYSIS</u>

### A. Ground One—*Faretta* Inquiry

Elliott argues that the trial court violated the Sixth Amendment by conducting an "inadequate" *Faretta*[4] inquiry. (Doc. 10 at 10.) According to Elliott, the colloquy was deficient because the court never asked about his "age, education, ability to read and write, or any mental or physical conditions." (*Id.* at 11.) The appellate court rejected this claim in an unexplained decision. (Doc. 14-1, Ex. F.) Thus, Elliott must show that "there was no reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98. He cannot do so.

"The Sixth Amendment safeguards to an accused who faces incarceration the right to counsel at all critical stages of the criminal process." *Iowa v. Tovar*, 541 U.S. 77, 80–81 (2004). But a defendant also "has a constitutional right to proceed without counsel when he voluntarily and intelligently elects to do so." *Faretta*, 422 U.S. at 807. "*Faretta* provides that when a defendant requests to discharge counsel

---

[4] *Faretta v. California*, 422 U.S. 806 (1975).

and to proceed pro se, a trial court should conduct an inquiry and make
the defendant 'aware of the dangers and disadvantages of self-
representation, so that the record . . . establish[es] that [the defendant]
knows what he is doing and his choice is made with eyes open.'" *Tuomi v.
Sec'y, Fla. Dep't of Corr.*, 980 F.3d 787, 798 (11th Cir. 2020) (quoting
*Faretta*, 422 U.S. at 835). But "while a pretrial hearing is preferred, it is
merely 'a means to the end,' and '[t]he failure to hold a *Faretta* hearing
is not error as a matter of law.'" *Id.* (quoting *United States v. Stanley*, 739
F.3d 633, 645 (11th Cir. 2014)). "The core inquiry is whether the
defendant understood the choices before him and the potential dangers
of proceeding pro se." *Jones v. Walker*, 540 F.3d 1277, 1293 (11th Cir.
2008). "If so, his waiver is valid." *Id.*

A reasonable jurist could find no *Faretta* violation here. Three
months before trial, Elliott moved to "represent himself in the case at
bar." (Doc. 14-1, Ex. A, at 42.) In his motion, he noted that he was a high
school graduate who could "read and write" and had "an adequate
understanding of law." (*Id.* at 41–42.) The court held a *Faretta* hearing.
(*Id.*, Ex. R.) It explained that it needed to "determine whether [Elliott
was] capable of representing [himself]." (*Id.* at 5.) It then recited the

disadvantages of proceeding pro se, noting that (1) "[h]e who represents himself has a fool for a client," (2) Elliott's appointed counsel had "a lot of experience and training," (3) even lawyers sometimes "represent themselves horribly" because they "get emotionally invested in [their] case," (4) the trial court would "hold [Elliott] to the standards that [it] hold[s] the lawyers to and [he would not] get away with doing things that people see on television and so forth," and (5) the appellate court might review his case and say, "Didn't follow the rules? Oh, well. Represented himself? That's a chance he took." (*Id.* at 7–11.) Elliott confirmed that despite these pitfalls, he still wished to represent himself. (*Id.* at 12.) The court found that Elliott was "competent to proceed [with] representing himself."[5] (*Id.* at 12–13.)

On this record, a reasonable jurist could conclude that Elliott "understood the choices before him and the potential dangers of proceeding pro se." *Jones*, 540 F.3d at 1293. Elliott is a high school

---

[5] On the morning of trial, the court again confirmed that Elliott wished to represent himself. (Doc. 14-1, Ex. S, at 9–11.) The court noted that after the *Faretta* inquiry, the prosecution had filed a notice of intent to seek habitual felony offender sentencing. (*Id.* at 9–10.) The court explained that Elliott now "fac[ed] up to 30 years if he were to be convicted as charged." (*Id.* at 10.) Elliott said he still wished to proceed without counsel. (*Id.* at 10–11.)

graduate who, by his own account, could "read and write" and had "an
adequate understanding of law." (Doc. 14-1, Ex. A, at 41–42.) He does not
claim to have any mental or physical ailments that affected his ability to
waive his right to counsel. (Doc. 10 at 10–14.) Nor does he say he lacked
an understanding of the charges or the potential penalties. (*Id.*) At the
*Faretta* hearing, the court repeatedly warned Elliott of "the dangers and
disadvantages of self-representation." *Faretta*, 422 U.S. at 835. It even
told him that "[h]e who represents himself has a fool for a client." (Doc.
14-1, Ex. R, at 8.) Yet he "remained steadfast in his desire to proceed pro
se." *Tuomi*, 980 F.3d at 799. Because a reasonable jurist could find that
Elliott waived his right to counsel "with eyes open," his *Faretta* claim
fails. *Faretta*, 422 U.S. at 835.

Elliott resists this conclusion, arguing that the court committed
"per se reversible error" by failing to inquire into his "age, education,
ability to read and write, or any mental or physical conditions." (Doc. 10
at 5, 11.) Elliott is mistaken. The Supreme Court has not "prescribed any
formula or script to be read to a defendant who states that he elects to
proceed without counsel." *Tovar*, 541 U.S. at 88; *see also Hooks v. State*,
286 So. 3d 163, 170 (Fla. 2019) ("[A] *Faretta* colloquy is not rendered

inadequate by the trial court's failure to inquire as to the defendant's age, experience, and understanding of the rules of criminal procedure."). Indeed, a *Faretta* hearing is not even "required," although it is "preferred." *Stanley*, 739 F.3d at 645. To prevail on his *Faretta* claim, Elliott must "point to evidence in the record from which a trier of fact could reasonably conclude [he] did not understand the dangers of self-representation at the time he waived his right to counsel." *Jones*, 540 F.3d at 1292. He has not done so. Thus, a reasonable jurist could conclude that Elliott—a literate high school graduate who claimed to have an adequate understanding of law—chose to represent himself "with eyes open." *Faretta*, 422 U.S. at 835.

## B. Ground Two—Failure to Raise Alleged Speedy Trial Violation

According to Elliott, appellate counsel should have argued that the trial court erroneously denied his "request for discharge [due to] a speedy trial violation." (Doc. 10 at 15.) The appellate court rejected Elliott's ineffective assistance claim in an unelaborated decision. (Doc. 14-1, Ex. Q.) As explained below, the request for discharge was meritless. Thus, Elliott cannot show that "there was no reasonable basis for" the appellate court's silent rejection of his claim. *Richter*, 562 U.S. at 98.

15

Elliott was arrested on January 2, 2019. (Doc. 14-1, Ex. A, at 14.) One month later, on February 7, he filed a pro se motion to proceed without counsel, which also contained a "demand for speedy trial." (*Id.* at 41.) This meant the prosecution had 60 days to try him. Fla. R. Crim. P. 3.191(b). If trial did not begin by then, Elliott needed to file "a separate pleading entitled 'Notice of Expiration of Speedy Trial Time.'" Fla. R. Crim. P. 3.191(b)(4), (p)(2). This filing would "trigger[] the recapture window"—"an additional ten-day period for the state to bring [Elliott] to trial after the default speedy trial period expires." *State v. Nelson*, 26 So. 3d 570, 574 (Fla. 2010). "Only after the . . . recapture period end[ed] [would Elliott be] entitled to file a 'motion for discharge' requesting an immediate discharge." *Wells v. McNeil*, No. 08-61621-CIV, 2009 WL 2767659, at *11 (S.D. Fla. Aug. 25, 2009). Thus, if Elliott "failed to file a notice of expiration of speedy trial," he could not be "discharg[ed] on speedy trial grounds." *State v. Pfeiffer*, 872 So. 2d 313, 316 (Fla. 4th DCA 2004); *see also* 22 West's Florida Practice Series § 14:13 (2025 ed.) ("Until th[e] notice [of expiration of speedy trial] is filed and served, a defendant is not entitled to rely upon the remedial provisions of [R]ule 3.191.").

Elliott did not comply with this procedure. He demanded a speedy trial on February 7, and the 60-day period expired on April 8. (Doc. 14-1, Ex. A, at 41.) But he never filed a notice of expiration of speedy trial. Instead, on April 14, Elliott submitted a "motion to discharge" based on the alleged violation of his speedy trial rights. (Doc. 8-1 at 741.) A "defendant who file[s] a motion for discharge rather than a notice of expiration of speedy trial . . . [is] not entitled to dismissal of the criminal charges pending against him." *Dabkowski v. State*, 711 So. 2d 1219, 1219–20 (Fla. 5th DCA 1998). "[S]trict compliance with [this] rule is not optional." *State v. Anderson*, 14 So. 3d 1159, 1160 (Fla. 4th DCA 2009). The notice "is designed to alert the clerk and the prosecution that the case must immediately be brought to the attention of the court by placing it on its calendar." *Dabkowski*, 711 So. 2d at 1220; *see also State v. Demars*, 848 So. 2d 436, 438 (Fla. 4th DCA 2003) ("[A] notice, not a motion, is required to trigger the expiration of [the] recapture period."). Because Elliott "did not file a notice of expiration of speedy trial," "he [was] not entitled to discharge." *Sterling v. State*, 728 So. 2d 340, 341 (Fla. 1st DCA 1999). Appellate counsel cannot be deemed "deficient for

failing to raise [this] meritless claim." *Freeman v. Att'y Gen.*, 536 F.3d 1225, 1233 (11th Cir. 2008).

To be sure, the trial court did not rely on this reasoning to deny Elliott's request for discharge. Instead, it found that his pro se demand for speedy trial was a "nullity" because he was "represented at that time by an attorney." (Doc. 8-1 at 743–44.) Elliott says this reasoning was mistaken because his demand for speedy trial "included the unequivocal request to discharge counsel." (Doc. 10 at 16.) But even if Elliott were right about that, the appellate court likely would have affirmed on the alternative basis set forth above. *See Taylor v. State*, 146 So. 3d 113, 116 n.3 (Fla. 5th DCA 2014) ("[I]f a trial court reaches the right result, but for the wrong reasons, it will be upheld if there is any basis which would support the judgment in the record."). "Appellate counsel is not ineffective for failing to raise claims reasonably considered to be without merit." *United States v. Nyhuis*, 211 F.3d 1340, 1344 (11th Cir. 2000).

## C. Grounds Three and Four—Failure to Raise Unpreserved Errors

Elliott faults appellate counsel for failing to raise two issues that were not preserved below. (Doc. 10 at 17–23.) First, the prosecution allegedly "presented insufficient evidence to establish that Elliott had

18

been previously convicted of battery." (*Id.* at 17.) Second, Elliott was allegedly "entitled to an acquittal for the charge of witness intimidation" because the prosecution failed to show that he "did anything to hinder, delay, or prevent Torgerson from communicating to law enforcement information relating to" a battery. (*Id.* at 19, 22.) According to Elliott, appellate counsel provided ineffective assistance by failing to raise both issues on appeal. (*Id.* at 18, 22.)

This claim is meritless. Elliott did not argue to the trial court that the evidence was insufficient to establish his prior battery conviction. (Doc. 14-1, Ex. S, at 165–71.) And while he did move for a judgment of acquittal, (*id.* at 82–99, 126–27), he never presented the "specific" argument he raises now—namely, the alleged absence of evidence that he tried to stop Torgerson from reporting a battery.[6] *See F.B. v. State*, 852 So. 2d 226, 230 n.2 (Fla. 2003) ("[A] motion or objection must be specific to preserve a claim of insufficiency of the evidence for appellate review."); *see also Stoddard v. State*, 185 So. 3d 696, 697 (Fla. 2d DCA

---

[6] Elliott's pro se status did not excuse him from the "legal requirements relating to the preservation of error." *Stueber v. Gallagher*, 812 So. 2d 454, 457 (Fla. 5th DCA 2002) ("In Florida, pro se litigants are bound by the same rules that apply to counsel.").

19

2016) (defendant "failed to preserve" argument that "differ[ed] substantially from the argument she raised before the trial court on her motion [for judgment of acquittal]").

Thus, the claim for ineffective assistance of appellate counsel turns on whether the alleged errors were "fundamental" under Florida law. If they were "not fundamental, then [Elliott's] appellate counsel would have been procedurally barred from raising [them] on appeal, and so he could not have been ineffective for failing to raise [them]." *Scott v. Sec'y, Dep't of Corr.*, 857 F. App'x 548, 551 (11th Cir. 2021); *see also Matheny v. State*, 15 So. 3d 658, 659 (Fla. 1st DCA 2009) ("Because the question of the sufficiency of the evidence was not preserved via a timely, specific challenge in the trial court, Appellant's claim is not cognizable on direct appeal unless he can demonstrate fundamental error.").

The appellate court rejected Elliott's ineffective assistance claim without explanation. (Doc. 14-1, Ex. Q.) Thus, it "implicitly" determined that any errors did not constitute fundamental error. *See Pinkney v. Sec'y, DOC*, 876 F.3d 1290, 1297 (11th Cir. 2017) (holding that, "[b]ecause the Florida Second District Court of Appeal denied [petitioner's] state habeas petition" without explanation, "the Florida court has already

20

determined, albeit implicitly, that the error was not fundamental error").

"[T]he fundamental error question is an issue of state law, and state law

is what the state courts say it is." *Id.* at 1299. Therefore, I "must defer to

the [state] court's underlying determination[]" that no fundamental error

occurred. *Id.* at 1297–98. Because the alleged errors were not

fundamental, "appellate counsel would have been procedurally barred

from [challenging them] on appeal." *Scott*, 857 F. App'x at 551. Counsel

"will not be held to have performed deficiently" where, as here, he "fail[s]

to perform a futile act, one that would not have gotten his client any

relief." *Pinkney*, 876 F.3d at 1297.

## D.  Ground Five—Failure to Challenge Exclusion of Torgerson's Waiver of Prosecution

Elliott says that appellate counsel should have challenged the

exclusion of Torgerson's "waiver of prosecution." (Doc. 10 at 23.) As Elliott

points out, Torgerson told law enforcement that "nothing happened" and

declined to testify at trial. (*Id.*) He claims that she also "signed a waiver

of prosecution." (*Id.*) At trial, Elliott tried to ask about the waiver, but

the court sustained the prosecution's objection without explanation. (Doc.

14-1, Ex. S, at 78.) According to Elliott, this ruling was erroneous because

the waiver "would have demonstrated that Torgerson consistently

maintained that nothing happened and that Elliott had nothing to do with her not cooperating with law enforcement or testifying at trial." (Doc. 10 at 25.) Elliott argues that, had counsel raised this issue on direct appeal, he would have received "a new trial." (*Id.*)

The appellate court rejected this claim without explanation. (Doc. 14-1, Ex. Q.) Once again, Elliott must show that "there was no reasonable basis for" that decision. *Richter*, 562 U.S. at 98. He cannot do so. A fairminded jurist could conclude that the "omitted claim" had no "reasonable probability of success on appeal" because the exclusion of the waiver was harmless. *Joiner v. United States*, 103 F.3d 961, 963 (11th Cir. 1997); *see also Boland v. Sec'y, Dep't of Corr.*, 278 F. App'x 876, 879 (11th Cir. 2008) (prejudice inquiry "requires that we determine whether the state court would have applied harmless error review"). And with no reasonable probability of success on appeal, Elliott cannot show prejudice from the omission of his claim.

A Florida appellate court "will not reverse where an error is harmless." *Peret v. State*, 301 So. 3d 437, 439 (Fla. 2d DCA 2020). The test for harmlessness is whether there is a "reasonable possibility that excluding [the] evidence . . . contributed to [the] conviction." *Mizell v.*

22

Case 8:23-cv-00636-KKM-TGW   Document 17   Filed 10/14/25   Page 23 of 30 PageID 1701

*State*, 350 So. 3d 97, 102 (Fla. 1st DCA 2022). Here, a fairminded jurist could find that any alleged error was harmless because Torgerson's waiver of prosecution was "cumulative in nature." *Prado v. State*, 372 So. 3d 272, 275 (Fla. 4th DCA 2023); *see also Andrews v. State*, 82 So. 3d 979, 984 (Fla. 1st DCA 2011) (finding harmless error where challenged testimony was "cumulative").

The jury heard extensive evidence of Torgerson's refusal to cooperate with the prosecution. After Elliott and Torgerson were separated, Torgerson told an officer that "nothing happened." (Doc. 14-1, Ex. S, at 57.) Moreover, she refused to allow the police to photograph the bruises on her arms, explaining that she "didn't want to cooperate" with the investigation. (*Id.* at 59, 66.) She also told the police that she "wasn't a victim of any crime." (*Id.* at 73.) And, as Elliott points out, Torgerson did not testify at trial. (Doc. 10 at 23.) In closing, Elliott used this evidence to argue that Torgerson "took the same viewpoint I did"— "nothing happened." (Doc. 14-1, Ex. S, at 137.) He highlighted her "statement[]" that "[t]here was no crime committed at any time," and he "ma[de] a big deal of [her]" refusal to prosecute "because she's the one this allegedly happened to." (*Id.* at 137, 140.)

23

In these circumstances, a fairminded jurist could conclude that any error in excluding Torgerson's waiver of prosecution "was harmless because the [waiver] was cumulative of other evidence presented to the jury." *Wallace v. State*, 766 So. 2d 364, 372 (Fla. 3d DCA 2000). Thus, the appellate court could reasonably have found that Elliott "was not prejudiced when counsel failed to argue the [evidentiary] issue on direct appeal." *Boland*, 278 F. App'x at 880.

## E. Ground Six—Failure to Challenge Witness Intimidation Conviction

According to Elliott, appellate counsel should have filed a Rule 3.800(b) motion and argued that he was wrongly convicted of second-degree witness intimidation.[7] (Doc. 10 at 25–26.) Witness intimidation is a second-degree felony if the defendant interferes with "the investigation or prosecution of a third-degree felony." Fla. Stat. § 914.22(2)(b). By contrast, witness intimidation is a third-degree felony if the defendant interferes with "the investigation or prosecution of a misdemeanor." *Id.* § 914.22(2)(a). Elliott argues that he should have been convicted of third-

---

[7] "If an appeal is pending, a defendant . . . may file in the trial court a motion to correct a sentencing error [under Rule 3.800(b)]. The motion may be filed by appellate counsel and must be served before the party's first brief is served." Fla. R. Crim. P. 3.800(b)(2).

degree witness intimidation—rather than second-degree witness intimidation—because the offense conduct "related to the investigation of a misdemeanor battery." (Doc. 10 at 27.) Elliott acknowledges that he was ultimately convicted of felony battery (second offense)—a third-degree felony. Fla. Stat. § 784.03(2). But in his view, the "prosecution's decision to eventually charge and prosecute [him] for a . . . a third-degree felony[] does not change/impact the fact that [his] alleged intimidation related to the investigation of a misdemeanor battery." (Doc. 10 at 27.) Elliott says that counsel should have raised this issue "by filing a motion to correct illegal sentence" under Rule 3.800(b). (*Id.* at 28.)

The appellate court disagreed but did not explain its reasoning. (Doc. 14-1, Ex. Q.) Once again, Elliott cannot prevail because the appellate court had a "reasonable basis" to deny relief—namely, that the challenge to his witness intimidation conviction was not cognizable under Rule 3.800(b). *Richter*, 562 U.S. at 98.

Rule 3.800(b) is used to correct "technical errors" in a trial court's "sentencing orders"—for example, the imposition of a sentence that "exceeds the statutory maximum," the improper assessment of "costs," or the "fail[ure] to award credit for time served." *Acosta v. State*, 399 So. 3d

1118, 1127 (Fla. 3d DCA 2024); *Rosado v. State*, 129 So. 3d 1104, 1108 (Fla. 5th DCA 2013). The rule "provide[s] defendants with a mechanism for correcting technical sentencing errors promptly and thereby preserv[ing] them for appellate review." *Baxter v. State*, 127 So. 3d 726, 732 (Fla. 1st DCA 2013). But Rule 3.800(b) "is not the correct procedural vehicle for attacking the merits of an underlying criminal conviction." *Profit v. State*, 382 So.3d 778, 780 (Fla. 1st DCA 2024); *accord Echeverria v. State*, 949 So. 2d 331, 335 (Fla. 1st DCA 2007).

Elliott argues that he should have been convicted of third-degree witness intimidation rather than second-degree witness intimidation. (Doc. 10 at 27-28.) That is a "challeng[e] [to] his conviction." *Melton v. State*, 386 So. 3d 603, 607 (Fla. 1st DCA 2024). Thus, he "could not raise [it] by motion under Rule 3.800(b)." *Id.* (defendant could not use Rule 3.800(b) to argue that he was wrongly convicted of "second-degree felony" rather than "third-degree felony"). Indeed, Elliott "could have but failed to object to the alleged error at the time of conviction." *Id.* A reasonable jurist could conclude that counsel was not deficient for failing to file a meritless Rule 3.800(b) motion. *See Sutherland v. Sec'y, Dep't of Corr.*, No. 8:20-cv-3037-KKM-UAM, 2023 WL 7386032, at *6 (M.D. Fla. Nov. 8,

2023) ("As the claim that [petitioner] contends counsel should have filed under Rule 3.800(b) would not have been cognizable, he does not show that trial counsel was deficient for not raising the claim.").

### F. Ground Seven—Failure to Challenge Habitual Felony Offender Sentence

According to Elliott, appellate counsel should have argued in a Rule 3.800(b) motion that his habitual felony offender ("HFO") sentence violated *Apprendi v. United States*, 530 U.S. 466 (2000).[8] (Doc. 10 at 28–29.) Without the HFO designation, Elliott faced a statutory maximum of 15 years' imprisonment. Fla. Stat. §§ 775.082(3)(d), 914.22(2)(b). With the HFO designation, the statutory maximum increased to 30 years' imprisonment—the sentence Elliott ultimately received. *Id.* §§ 775.082(3)(b), 775.084(4)(a)2, 914.22(2)(b). *Apprendi* held that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490. Elliott argues that the trial court violated *Apprendi* by sentencing him as an HFO without a jury finding that the enhancement was

---

[8] "*Apprendi* claims are properly preserved by a Rule 3.800(b) motion." *Flournoy v. State*, 415 So. 3d 806, 808 (Fla. 2d DCA 2025).

necessary "for the protection of the public." (Doc. 10 at 29.) He says that, had counsel raised this issue on direct appeal, he would have received "a new sentencing with his sentencing exposure capped at 15 years." (*Id.* at 30.)

The appellate court rejected Elliott's claim without explanation. (Doc. 14-1, Ex. Q.) Because a "reasonable basis" existed for that decision, Elliott is not entitled to relief. *Richter*, 562 U.S. at 98.

The Fifth District Court of Appeal affirmed Elliott's convictions in June 2020. (Doc. 14-1, Ex. F.) Almost fifteen years earlier, the Fifth District had rejected an *Apprendi* challenge to the HFO statute, ruling that "the habitual offender statutes meet constitutional muster." *Roberts v. State*, 923 So. 2d 578, 582 (Fla. 5th DCA 2006) (citing *Gudinas v. State*, 879 So. 2d 616, 619 (Fla. 2004)). That precedent was binding at the time of Elliott's appeal. *See O'Brien v. State*, 478 So. 2d 497, 499 (Fla. 5th DCA 1985) ("[A] three-judge panel should not expressly overrule or recede from a prior decision of this court on the same point of law."). Thus, counsel was not deficient for deciding to "forego a claim that was a loser

under the then-current state of the law."[9] *Jones v. United States*, 224 F.3d 1251, 1258 (11th Cir. 2000).

## V.   **CERTIFICATE OF APPEALABILITY**

A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1). Instead, a district court or court of appeals must first issue a certificate of appealability (COA). *Id.* "A [COA] may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To obtain a COA, Elliott must show that reasonable jurists would find debatable both the merits of the underlying claims and the procedural issues he seeks to raise. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Elliott has not made the requisite showing.

---

[9] In April 2025, the Fourth District Court of Appeal stated that, in the light of *Erlinger v. United States*, 602 U.S. 821 (2024), a trial court should "convene[] a jury to designate [a defendant] as an HFO." *Jackson v. State*, 410 So. 3d 4, 10 (Fla. 4th DCA 2025). The Fifth District has yet to address *Erlinger*'s impact on HFO sentencing. *See Scott v. State*, 413 So. 3d 276, 278 (Fla. 5th DCA 2025) (declining to "address the constitutionality of Florida's HFO statute" post-*Erlinger*). Regardless, *Erlinger* was decided four years after Elliott's direct appeal, and counsel cannot be deficient for "failing to predict what was not yet a certain holding." *Black v. United States*, 373 F.3d 1140, 1146 (11th Cir. 2004); *see also Geter v. United States*, 534 F. App'x 831, 836 (11th Cir. 2013) ("It is well-settled that an attorney's failure to anticipate a change in the law will not support a claim of ineffective assistance of appellate counsel." (collecting cases)).

Finally, because Elliott is not entitled to a COA, he is not entitled to appeal in forma pauperis.

It is therefore **ORDERED** that Elliott's Petition for Writ of Habeas Corpus, (Doc. 1), is **DENIED**. The **CLERK** is directed to enter judgment against Elliott and in Respondent's favor and to **CLOSE** this case.

**ORDERED** in Tampa, Florida, on September 14, 2025.


Kathryn Kimball Mizelle
United States District Judge